CONNER, J.
Elizabeth Marshall-Beasley (“Former Wife”) appeals the final judgment dissolving her marriage to James W. Beasley, Jr., (“Former Husband”) following trial as to equitable distribution and bridge-the-gap alimony. Specifically, she challenges six decisions by the trial court: (1) the award of the marital home to her, (2) the amount of employment income imputed to her, (3) the award of bridge-the-gap alimony instead of permanent periodic alimony, (4) the determination of jewelry gifts by Former Husband to be a marital rather than nonmarital asset, (5) Former Husband’s post-petition spending was not waste, and (6) Former Husband’s pre-petition advance distribution of his 401 (k) account was taxed properly. We affirm.

Factual Background

The parties were married in 1986. Their marriage lasted 21 years, and they had no children. Former Husband, 66 at the time of trial, historically has earned $400,000 a year as a litigation attorney; he plans to retire in mid-2018 at 70. Former Husband is a 90% shareholder in a small litigation law firm with a negative net worth. He is the only member of the firm who personally guarantees the firm’s lease and line of credit. At the time of trial, Former Husband personally was indebted to Northern Trust for $618,507 that he had borrowed and loaned to the firm.
Former Wife, 50 at the time of trial, has impressive educational and professional credentials. She has a degree from Princeton University in urban policy and planning. During the marriage, she obtained a degree in drafting and design and a master’s degree in landscape architecture. She has been on the State Board of Landscape Architecture since 2002, the highest state regulatory body in the profession, and has served as the chair of that organization.
*754 From 2001 until their separation, the parties enjoyed a comfortable lifestyle. Their pre-petition expenses exceeded their combined income from investments and employment, which required them to invade the principal of their investment accounts. In mid-June, 2008, Former Husband vacated the marital home in Palm Beach (“Bahama Lane”). In August, 2008, he withdrew $450,000 from his 401 (k) account to buy a separate local residence. The amount of the funds after income tax was $351,112. Former Husband used a portion of these funds as a down payment on a house in West Palm Beach (“Rugby Road”) in October, 2008. Former Wife petitioned for dissolution on September 1, 2009, and sought exclusive possession of Bahama Lane. Prior to trial, Former Wife decided that she wanted to buy a $1.4 million cottage in Palm Beach and to sell Bahama Lane. Given the stock market and real estate plummets, costs, and depreciation, approximately $9 million marital assets remained for distribution between the parties.
Following trial, the judge awarded Bahama Lane to Former Wife and the Nantucket vacation home to Former Husband; the houses were approximately of equal value. The judge equally divided the assets and gave Former Husband and Former Wife each $4.5 million in real and personal property, including accounts and investments. The judge found Former Wife’s reasonable after-tax needs to be $10,000 per month, and her expected income after taxes to be $12,166 per month, including $50,000 per year of professional income after taxes. The trial judge awarded $4,000 per month bridge-the-gap alimony for a year to give Former Wife time to develop her professional earning ability and to liquidate Bahama Lane.

Legal Analysis

We review a trial court’s equitable distribution of marital assets and an award of alimony for abuse of discretion. Lule v. Lule, 60 So.3d 567, 569 (Fla. 4th DCA 2011); Rafanello v. Bode, 21 So.3d 867, 869 (Fla. 4th DCA 2009). By statute, a trial court must formulate a complete equitable distribution: “In any contested dissolution action wherein a stipulation and agreement has not been entered and filed, any distribution of marital assets or marital liabilities shall be supported by factual findings in the judgment or order based on competent substantial evidence with reference to the factors enumerated in subsection (1).” § 61.075(3), Fla. Stat. (2009) (emphasis added). We apply these review standards in addressing the issues on appeal.

Bahama Lane Residence

Although the trial judge had invited the parties to submit a complete written agreement of equitable distribution, they did not do so. The Joint Equitable Distribution Update that was provided to the judge on the first day" of trial testimony was a listing of assets that the parties had valued and those left for the court to determine. The valuations to which the parties stipulated were limited to real property and brokerage accounts and not all their assets for equitable distribution. The judge ascertained that the parties understood that the equitable distribution was to be decided by the court:
... I’m not bound at all in the work I’m asked to do on a trial by the request you’ve made about how you would like to have things equitably distributed. That’s something I have to figure out, and I have to have the ability to work with whatever assets and liabilities there are to make it come up fairly and equitably.
Regarding Bahama Lane, Former Wife argues that she and Former Husband entered into a joint stipulation providing that the marital home would go to Former *755 Husband and that the trial judge erred by ignoring their stipulation. She asserts that she cannot afford Bahama Lane’s overhead and that it will not be easy to sell the house, even with aggressive marketing. The parties, however, never “unequivocally agreed or stipulated to the court” to award Bahama Lane to Former Husband. Farrell v. Farrell, 661 So.2d 1257, 1259 (Fla. 3d DCA 1995). A binding agreement to convey real property from the marital estate to one of the parties requires a writing signed by the parties, or an explicit bilateral stipulation on the record before a court reporter. See § 725.01, Fla. Stat. This alleged joint stipulation had neither, and no agreement was “entered and filed” in accordance with section 61.075(3).
In determining Former Wife’s property and support claims, the trial judge reasoned that she could liquidate Bahama Lane, valued at $1.85 million, within the bridge-the-gap period. Thereafter, Former Wife could relocate, as did Former Husband, to a lower-priced home free of debt. She would be able to support herself with investment income and the sale proceeds from Bahama Lane. Because there was no valid agreement conveying Bahama Lane to Former Husband, the trial judge did not abuse his discretion in making it part of the overall distribution of the marital estate assets.

Imputed Income

Former Wife argues that the final judgment lacks the required findings to impute to her annual income of $50,000, when she never grossed more than $25,000 a year as a landscape architect. “The standard of review of a court’s decision to impute income is whether it is supported by competent, substantial evidence.” Mount v. Mount, 989 So.2d 1208, 1209 (Fla. 2d DCA 2008). Former Wife has a Princeton undergraduate degree, two postgraduate degrees, and 25 years of executive business experience.
More than 20 years ago, Former Wife earned $40,000 to $50,000 annually in top managerial jobs. Former Wife’s estimation of her earning capacity, as reported on her professional insurance applications, declined after her first consultation with a divorce attorney. Her last work for a paying client was in 2007. By mid-2009, Former Wife represented that she might be mentally or physically unable to work, although she regularly went to her office. When Former Husband sought discovery on Former Wife’s health issues, they were withdrawn two months before trial.
Former Wife’s hourly billing was below market rate. Despite her extensive marketing background, Former Wife did not create a portfolio, have a website, or photograph her work, and she did minimal advertising and marketing. Her failure to promote herself through standard marketing avenues inhibited her ability to acquire clients, which depressed her income. Jennifer Tighe, a landscape architect and acquaintance of Former Wife, testified at trial that it was important for landscape architects to be aggressive in their marketing efforts in the current economy. She further testified that Former Wife had an advantage procuring government contracts, because Former Wife’s firm is considered to be both minority-owned and a small business.
Former Husband had encouraged Former Wife to advertise and had persuaded her to issue a press release, at his expense, using his firm’s public relations company. Former Wife, however, refused to have photographs taken of her work. She had not joined professional organizations, such as the local chapter of the American Institute of Architects. She also did not take advantage of longstanding contacts for which she had worked previously, such as *756 employment with a worldwide entertainment enterprise and former Florida governor.
Former Husband’s vocational expert testified that Former Wife was well qualified as a landscape architect and had skills that exceeded a typical landscape architect. The median income for landscape architects was $59,638 at the time of trial. Former Wife’s credentials and experience did not support her contention that she could perform at only the lowest percentile of licensed landscape architects. Former Husband’s vocational expert concluded that Former Wife could earn $60,000 at the time of trial as a sole practitioner, which would increase to $112,000 to $150,000 in the near future. If she could not succeed practicing alone, then Former Wife could expect to earn $72,000 as a firm employee. The vocational expert also had located advertisements for employment for which Former Wife was qualified.
Former Wife had not sacrificed her career to rear children, to maintain a home, or to promote Former Husband’s career. Instead, by working full-time as a litigation attorney, Former Husband had financed and encouraged Former Wife’s pursuit of her landscape architecture degree and license. He completely had supported her while she was in graduate school and studied for her license exam. He further had provided her a “lovely” office and encouraged her to develop her practice after completing her degree.
“A court may impute income where a party is willfully earning less and the party has the capability to earn more by the use of his best efforts.” Schram v. Schram, 932 So.2d 245, 249 (Fla. 4th DCA 2005). This court considered imputation of earning $38,000 a year to a former spouse who voluntarily terminated her employment with a retail store to be supported by competent substantial evidence. Zarycki-Weig v. Weig, 25 So.3d 573, 575 (Fla. 4th DCA 2009). In considering imputation of income, “the court must determine whether the subsequent unemployment resulted from the spouse’s pursuit of her own interests or through less than diligent and bona fide efforts to find employment paying income at a level equal to or better than that formerly received.” Id. (citation, internal quotation marks, and alteration omitted). In affirming, this court did not “second-guess” the trial court’s finding that the former wife’s “evidence of her inability to work was not credible.” Id.
In this case, the evidence showed that Former Wife chose not to use her degrees, license, and 25 years of marketing experience to actualize her earning capability. In the final judgment, the trial judge concluded: “There is no question from the evidence that the wife has made little or no effort to earn an income consistent with the level of her work experience, education, and ability for years prior to and during the pendency of this divorce litigation.” The judge’s finding that Former Wife is capable of earning $50,000 a year is reasonable and supported by competent substantial trial evidence. See Fitzgerald v. Fitzgerald, 912 So.2d 363, 368 (Fla. 2d DCA 2005) (finding, when former wife had an earning history of up to $57,000 a year, a vocational expert’s testimony was competent substantial evidence that former wife could be imputed $40,900 earning capability a year).

Bridge-the-Gap Alimony

Based on 21 years of marriage, Former Wife contends that the trial judge erred in not awarding her permanent periodic alimony. She further contends that the bridge-the-gap alimony of $4,000 a month for one year, two-thirds of which is required to maintain Bahama Lane, is insufficient to provide financial stability until her investments begin to generate ade *757 quate funds, and she can establish her landscape architecture business. “A trial court’s decision on whether to award permanent periodic alimony is subject to an abuse of discretion standard of review.” Hornyak v. Hornyak, 48 So.3d 858, 861 (Fla. 4th DCA 2010); see Mondello v. Torres, 47 So.3d 389, 396 (Fla. 4th DCA 2010) (noting that “the nature and amount of an award of alimony is a matter committed to the sound discretion of the trial court” (citation, internal quotation marks, and alteration omitted)); § 61.08(2), Fla. Stat. (2009).[1] This decision is based on “the needs of the spouse requesting the alimony and the ability of the other spouse to make alimony payments.” Leonardis v. Leonardos, 30 So.3d 568, 570 (Fla. 4th DCA 2010) (citation and internal quotation marks omitted). “The criteria to be used in establishing this need include the parties’ earning ability, age, health, education, the duration of the marriage, the standard of living enjoyed during its course, and the value of the parties’ estates.” Mallard v. Mallard, 771 So.2d 1138, 1140 (Fla.2000) (citation and internal quotation marks omitted).
“The standard-of-living is not a super-factor” over the other considerations. Donoff v. Donoff, 940 So.2d 1221, 1225 (Fla. 4th DCA 2006); see Pirino v. Pirino, 549 So.2d 219, 220 (Fla. 5th DCA 1989) (“Indeed, it is the exceptional case when a couple’s resources and earnings prove sufficient to maintain two independent households in the same manner as the original household.”). “[T]he parties’ standard of living during the marriage is not a useful guide in awarding alimony where the parties lived beyond their means,” as in this case. Nichols v. Nichols, 907 So.2d 620, 623 (Fla. 4th DCA 2005) (citation and internal quotation marks omitted); see § 61.08(2)(a), Fla. Stat.
The trial judge considered the section 61.08(2) factors. Former Wife claimed that she needed $12,000 a month in alimony, based on her assertion that she could earn only $25,000 a year. Her alleged needs included the purchase of clothing, a personal trainer, daily maid service, flowers, gifts, club dués and charges, vacations, beauty salon, and spa. “Clearly the husband cannot be required to maintain the wife’s standard of living when this maintenance stretches beyond his financial capacity.” Pirino, 549 So.2d at 220. Alimony is not intended “to fund the enjoyment of every little luxury enjoyed before divorce.” Levine v. Levine, 964 So.2d 741, 743 (Fla. 4th DCA 2007).
In contrast to permanent periodic alimony, “[b]ridge-the-gap alimony is designed to ease the transition of a spouse from married to single life.” Homyak, 48 So.3d at 862. It “is most appropriately awarded in instances where the receiving *758 spouse is already employed, possesses adequate employment skills, and requires no further rehabilitation other than a brief time to ease the transition to single life.” Cohen v. Cohen, 39 So.3d 403, 406 (Fla. 4th DCA 2010) (citation and internal quotation marks omitted); see Wofford v. Wofford, 20 So.3d 470, 474 (Fla. 4th DCA 2009) (“Bridge-the-gap alimony serves to assist a spouse already capable of self-support during the transition from being married to being single.” (citation, internal quotation marks, and alteration omitted)). “Where no rehabilitative plan is presented, a bridge-the-gap award must have a relatively brief durational limit.” Hornyak, 48 So.3d at 862; see Mills v. Mills, 948 So.2d 885, 886 (Fla. 3d DCA 2007) (“Bridge-the-gap alimony is to assist a spouse with any legitimate, identifiable, short-term need.” (citation, internal quotation marks, and ellipsis omitted)). The Fifth District Court of Appeal en banc affirmed a twelvemonth, bridge-the-gap alimony, where “the former wife ha[d] adequate employment skills and an exemplary employment record” as not being an abuse of discretion. Engesser v. Engesser, 42 So.3d 249, 252 (Fla. 5th DCA 2010) (en banc).
In the final judgment, the trial judge noted that Former Wife has a net worth of $4.5 million with no marital debts. In addition, Former Husband’s income will be substantially reduced when he retires in 2013 at 70. The parties had no children, and Former Wife’s impressive education, marketing experience, and her own landscape architecture business, as well as being younger with more earning years than Former Husband, would enable her to supplement her income to provide for a suitable standard of living. This court has recognized that “[djisparity in income alone does not justify an award of permanent periodic alimony” and that “[a]n award of permanent alimony is improper where the evidence does not reflect permanent inability on the part of the wife to become self-sustaining.” Rosecan v. Springer, 845 So.2d 927, 929, 930 (Fla. 4th DCA 2003) (citation and internal quotation marks omitted). There was no abuse of discretion in the trial judge’s awarding Former Wife one year of bridge-the-gap alimony and not awarding her permanent periodic alimony.

Jewelry Gifts

Former Wife contends that a portion of her jewelry collection was a non-marital asset, based on a deed of gift given to her by Former Husband. It is undisputed by the parties that all of Former Husband’s jewelry gifts to Former Wife were purchased with marital funds. “Marital assets” include “[i]nterspousal gifts during the marriage.” § 61.075(6)(a)l.c., Fla. Stat. (2009); see Ruiz v. Ruiz, 548 So.2d 699, 699-700 (Fla. 3d DCA 1989) (reversing trial court for failing to treat the uncontroverted purchase of jewelry with marital assets as marital property subject to equitable distribution and citing § 61.075 relating to interspousal gifts as declaratory of Florida law). “Under well-established statutory and case law, an in-terspousal gift during the marriage is a marital asset.” Maddox v. Maddox, 750 So.2d 693, 694 (Fla. 1st DCA 2000); cf. Gardner v. Gardner, 452 So.2d 981, 983-84 (Fla. 5th DCA 1984) (“Separate property of a spouse includes assets of one spouse acquired from a source outside or unconnected with the marriage, such as by inheritance, property owned prior to marriage, or gifts from third parties.”). Any gift of jewelry from Former Husband to Former Wife bought with marital assets remains a marital asset. The alleged written deed, which was not admitted into evidence, would confirm solely that an in-terspousal gift was made. Former Wife introduced no evidence showing an intent to remove the jewelry from the marital estate. Her assertion that the jewelry is *759 nonmarital property is contrary to the plain language of section 61.075(6).

Post-petition Spending

Former Wife had sought an equalization credit of approximately $300,000 after distribution of all assets for Former Husband’s alleged post-petition spending. Former Wife, however, failed to establish that any of Former Husband’s post-petition spending constituted waste. The trial judge concluded that Former Wife’s claim was “not credible” and “not supported by the evidence,” because there was “approximately equal non-wasteful spending by both parties.” Therefore, no credit was “given for the spending differential between the husband and the wife on non-litigation subjects during the pendency of this case.” On appeal, Former Wife asserts that she is entitled to a $73,567 credit for Former Husband’s post-petition spending, based on Former Husband’s concession, which he denies. Because the trial judge did not abuse his discretion in concluding that Former Wife was not eligible for any equalizing post-distribution payment from Former Husband for post-petition spending, we will not disrupt the court’s equitable distribution with an additional monetary credit, when the trial judge found none of Former Husband’s post-petition spending to be waste. See Bush v. Bush, 824 So.2d 293, 294 (Fla. 4th DCA 2002) (recognizing error to include as part of the equitable distribution scheme a portion of stock options husband had depleted during dissolution proceedings to satisfy couple’s financial obligations).

Pre-petition í01(k) Advance Distribution

Former Wife argues that the trial judge erred in finding that Former Husband’s advance distribution of his 401 (k) account was $351,112 rather than $450,000. When Former Husband withdrew $450,000 from his 401(k) to purchase Rugby Road, his bank was required to withhold almost $100,000 for income taxes. Former Wife contends that Former Husband depleted his 401 (k) account as a marital asset.
Former Wife received a credit for the net amount of the withdrawal of $351,112 in the equitable distribution. The withdrawal occurred pre-petition, and the resulting income tax liability was incurred at that time. The bank properly withheld income taxes on Former Husband’s withdrawal from his 401 (k) account. Former Husband’s certified public accountant testified at trial that there was no depletion because Former Husband was beyond retirement age and his work expectancy. Therefore, his 401 (k) account necessarily was going to be withdrawn and taxed. Even Former Wife’s certified public accountant viewed Former Husband’s tax-deferred retirement assets as an immediately accessible source of income.
In the final judgment, the trial judge “accepted] the treatment accorded the 401 (k) withdrawal by husband’s accounting expert ... as being equitable and accurate.” In an equitable distribution of marital assets, “[t]he trial court’s findings are entitled to the presumption of correctness accorded to trial court judgments where the credibility of witnesses is a factor.” Rafanello, 21 So.3d at 869 (citation and internal quotation marks omitted). Based on the accounting testimony, the trial judge did not err in determining that Former Husband’s advance distribution of his 401(k) account was $351,000 instead of $450,000, because of the deferred taxes withheld by the bank.
We affirm the trial court’s final judgment as to all issues challenged on appeal.

Affirmed.

WARNER and POLEN, JJ., concur.

. In determining a proper award of alimony or maintenance, the court shall consider all relevant economic factors, including but not limited to:
(a) The standard of living established during the marriage.
(b) The duration of the marriage.
(c) The age and the physical and emotional condition of each party.
(d) The financial resources of each party, the nonmarital and the marital assets and liabilities distributed to each.
(e) When applicable, the time necessary for either party to acquire sufficient education or training to enable such party to find appropriate employment.
(f) The contribution of each party to the marriage, including, but not limited to, services rendered in homemaking, child care, education, and career building of the other party.
(g) All sources of income available to either party.
The court may consider any other factor necessary to do equity and justice between the parties.
§ 61.08(2), Fla. Stat.